107 Cal.Rptr.2d 579 (2001)
89 Cal.App.4th 546
The PEOPLE, Plaintiff and Respondent,
v.
Jose Luis RODRIGUEZ, Defendant and Appellant.
No. B142586.
Court of Appeal, Second District, Division Three.
May 31, 2001.
Review Granted September 12, 2001.
*580 Athena Shudde, San Diego, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, Chung Mar and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.
*581 CROSKEY, J.

INTRODUCTION
In 1989, our Legislature enacted Penal Code section 288.5 [1] observing in that section's legislative declaration of purpose that "there is an immediate need for additional statutory protection for the most vulnerable among our children, those of tender years, some of whom are being subjected to continuing sexual abuse by those commonly referred to as `resident child molesters.' These molesters reside with, or have recurring access to, a child and repeatedly molest the child over a prolonged period of time but the child, because of age or the frequency of the molestations, or both, often is unable to distinguish one incident from another ..., and as a consequence prosecutors are unable to ... overcome ... constitutional due process problems...."[2] Today, guided by that express legislative declaration, we decide instructional and sufficiency issues arising from language in section 288.5, subdivision (a), making that subdivision applicable to "[a]ny person who . .. has recurring access to the child... ." (Italics added.)
Jose Luis Rodriguez appeals from the judgment entered following his convictions by jury of two counts of continuous sexual abuse of a child (Pen.Code, § 288.5, subd. (a)). He was sentenced to prison for 28 years.
We reject Rodriguez's contention that the phrase "recurring access" in section 288.5, subdivision (a), has a technical meaning and that the trial court erroneously failed to instruct thereon; we conclude the phrase requires only that the circumstances of "access" be "recurring." To the extent that People v. Gohdes (1997) 58 Cal.App.4th 1520, 68 Cal.Rptr.2d 719 (which was not a case involving alleged instructional error but alleged evidentiary insufficiency at a preliminary hearing), suggests that the phrase "recurring access" has a technical meaning, we believe Gohdes's reasoning and result were flawed, that both were impacted by a unique set of facts that caused Gohdes to effectively rewrite the subdivision apparently to avoid what the Gohdes court viewed as a harsh result, and that, in any event, Gohdes did not invest the phrase "recurring access" with a technical meaning. Moreover, we reject Rodriguez's related contentions that, because there was insufficient evidence of "recurring access," there was insufficient evidence to support his convictions.
Finally, we accept respondent's concession and hold that Rodriguez's section 1202.4, subdivision (b), and section 1202.45 restitution fines must be reduced; we will modify the judgment accordingly.

FACTUAL SUMMARY
Viewed in accordance with the usual rules on appeal (People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103), the evidence, the sufficiency of which (except for the evidence of "recurring access") is undisputed, established that Fernando V. was born in May 1983. Fernando V. lived on Paxton and Glenoaks in Los Angeles County. Rodriguez lived four houses from Fernando V, in a trailer on the back of a lot. Everyone who lived on the block knew Rodriguez because he was a soccer coach and participated in soccer activities with neighborhood children. Fernando V. was not on Rodriguez's soccer team, but his older brother *582 was,[3] and Fernando V. would watch his brother play. Fernando V. would also "do whatever [Rodriguez] would tell him to do," and run errands for Rodriguez, such as getting him a soda.
Rodriguez molested Fernando V. when he was seven years old, that is, in about 1990, and continued to molest him until he was about nine years old. (Count two.) The first incident occurred when Fernando V. exited a store next door to his residence and observed Rodriguez seated in a car. After Rodriguez called him, Fernando V. went to the car and observed that Rodriguez had a gun. Rodriguez told Fernando V. to come to his trailer the next day, and threatened to kill Fernando V. if he did not. Before this incident, Fernando V. had known Rodriguez for several years, and Rodriguez never had acted in a threatening manner toward Fernando V.
The next day, Fernando V. went to Rodriguez's trailer. Rodriguez played a pornographic video. Fernando V. did not want to watch, but Rodriguez tried to make him watch. When Fernando V. tried to leave, Rodriguez stood at the door of the trailer and prevented him from doing so, pushing him towards a bed.
Rodriguez then masturbated and told Fernando V. "to do stuff or he would die. Rodriguez grabbed Fernando V, threw him on the bed, and pushed him down. Rodriguez told Fernando V. to grab Rodriguez's penis; Fernando V. complied. Rodriguez engaged in oral sex with Fernando V, threatening to kill Fernando V. if he did not participate. Rodriguez removed Fernando V.'s pants and underwear. Rodriguez then sodomized Fernando V. Rodriguez told Fernando V. to go home, and threatened to kill him if he said anything to his family.
After this first incident, Rodriguez repeatedly molested Fernando V. in similar ways on school days and weekends in the trailer. At one point, the sexual molestations occurred almost every day. When Rodriguez would sodomize Fernando V, Rodriguez would have Fernando V. bend over, then grab him by the waist. Rodriguez would have Fernando V. bend over both on and off the bed. Sometimes, Rodriguez used a lubricant. When Rodriguez would have Fernando V. orally copulate him, Rodriguez would grab Fernando V. by his head. Rodriguez continued to threaten Fernando V, and indicated that if anyone learned what was happening, Fernando V. or his mother would die. Fernando V. recalled seeing a gun on two or three occasions when he was in the trailer, including once when Rodriguez threatened to shoot Fernando V. if he tried to leave.
Ernesto R. was born in August 1987. From 1990 to 1998, Ernesto R. lived in his grandparents' house on the same lot where Rodriguez's trailer was located. Rodriguez regularly used a bathroom inside the residence where Ernesto R. lived. Ernesto R. knew Rodriguez was a soccer coach. Ernesto R.'s mother viewed Rodriguez as if he were an uncle to Ernesto R. and her other children. She allowed Rodriguez to take them out.
When Ernesto R. was about seven or eight years old, that is, in about 1994 or 1995, Rodriguez began sexually molesting Ernesto R. two to three times a week, every week, for about two or three years. (Count one.) The first incident occurred after Ernesto R. entered Rodriguez's trailer while Ernesto R.'s uncle was there with Rodriguez. After the uncle left, Rodriguez touched Ernesto R.'s "front parts" through *583 his clothing. Rodriguez then put his hand down Ernesto R.'s pants and opened Ernesto R.'s belt. Ernesto R. tried to get away but Rodriguez hugged him with one hand while touching him with the other. On another occasion in the trailer, Rodriguez began touching Ernesto R.'s buttocks through his clothing when the uncle's back was turned.
On still other occasions in the trailer, Rodriguez would play pornographic movies in Ernesto R.'s presence. Rodriguez would pull Ernesto R.'s pants and underwear down, place his elbow against Ernesto R.'s back and push him down on the bed, then sodomize him. Rodriguez also put his penis in Ernesto R.'s mouth more than five times. Rodriguez frequently would force Ernesto R. into Rodriguez's trailer and, sometimes, Rodriguez would show Ernesto R. pornographic magazines.
When Ernesto R. was seven or eight years old, Rodriguez once or twice raised Ernesto R.'s feet in the air and sodomized him while Ernesto R. was in bed in his grandparents' room. Rodriguez also molested Ernesto R. in his mother's room. Sometimes during early mornings when Ernesto R. was sleeping in his mother's room, Rodriguez would remove Ernesto R.'s pants and underwear, touch Ernesto R.'s buttocks with Rodriguez's hands, and sodomize Ernesto R. This occurred more than five times. When Ernesto R. slept in the living room, Rodriguez would come and touch the outside of Ernesto R.'s clothing, put his hand down the front of Ernesto R.'s pants, or wave his penis near Ernesto R.'s face. This occurred about two or three times a week. Rodriguez threatened to hit Ernesto R. and tell his mother that Ernesto R. asked Rodriguez to commit the acts. In defense, Rodriguez denied the offenses and presented alibi evidence as to the molestations.

CONTENTIONS
Rodriguez contends: (1) "[t]he trial court erred in failing to instruct the jury, sua sponte, on the meaning of the technical term `recurring access' in Penal Code section 288.5"; (2) "[t]he evidence in count 2 was insufficient to support the finding of recurring access[ ] within the meaning of [Penal Code] section 288.5"; (3) "[t]he evidence in count 1 was insufficient to support the finding of `recurring access' within the meaning of [Penal Code] section 288.5"; and (4) "[t]he $12,000 restitution and parole restitution fines were unauthorized and must be set aside or reduced to $10,000."

DISCUSSION

1. The Court Did Not Err By Failing To Define The Phrase "Recurring Access."

a. The Phrase "Recurring Access" Does Not Have A Technical Meaning.

Rodriguez was charged in each of counts one and two with continuous sexual abuse of a child, a violation of section 288.5, subdivision (a).[4] The court, using CALJIC No. 10.42.6, instructed the jury on that *584 offense.[5] Rodriguez did not request amplification of the phrase "recurring access" found in that instruction. Rodriguez does not dispute the validity of CALJIC No. 10.42.6 per se, but claims the phrase "recurring access" is technical and, therefore, the trial court reversibly erred by failing to define it.[6] Because Rodriguez's claim impacts his sufficiency contentions as well, we will examine it in some detail.
In People v. Estrada (1995) 11 Cal.4th 568, 46 Cal.Rptr.2d 586, 904 P.2d 1197, our Supreme Court set forth the law applicable to instructional claims such as Rodriguez's.[7] In particular, Estrada noted that the rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request. A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning. Thus, terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. (People v. Estrada, supra, 11 Cal.4th at pp. 574-575, 46 Cal. *585 Rptr.2d 586, 904 P.2d 1197, and cases cited.)
There is no dispute that CALJIC No. 10.42.6, using the statutory language, instructed the jury as to the elements of section 288.5, subdivision (a), and instructed the jury that one such element was "recurring access." Since Rodriguez did not request amplification as to the definition of that phrase, the trial court was not obligated to define it unless the phrase had a "technical sense peculiar to the law," that is, a "statutory definition differing] from the meaning that might be ascribed to the same terms in common parlance." (People v. Estrada, supra, 11 Cal.4th at p. 574-575, 46 Cal.Rptr.2d 586, 904 P.2d 1197.)
Section 288.5 was enacted to remedy problems of pleading and proof that arose when defendants who were living, or having close and continuing contact, with children they were molesting were prosecuted under section 288, subdivision (a). (People v. Grant (1999) 20 Cal.4th 150, 155-156, 83 Cal.Rptr.2d 295, 973 P.2d 72.)[8] By its *586 terms, section 288.5, subdivision (a), applies to "[a]ny person who either resides in the same home with the minor child or has recurring access to the child, ..." (Italics added.)
In common parlance, the term "access" means "a: permission, liberty, or ability to enter, approach, communicate with, or pass to and from [ ... ] b: freedom or ability to obtain or make use of." (Merriam Webster's Collegiate Diet. (10th ed.1995) p. 6.) The term "recur[ ]" means "to occur again after an interval: occur time after time." (Id. at p. 978, 83 Cal. Rptr.2d 295, 973 P.2d 72.) Thus, in common parlance, the phrase "recurring access" means (1) a permission, liberty, or ability to enter, approach, communicate with, or pass to and from, which permission, liberty, or ability occurs again after an interval, or occurs time after time and/or (2) a freedom or ability to obtain or make use of, which freedom or ability occurs again after an interval, or occurs time after time. Unless there is a different technical definition for the phrase "recurring access," Rodriguez's instructional claim must fail. (See People v. Estrada, supra, 11 Cal.4th at pp. 574-575, 46 Cal. Rptr.2d 586, 904 P.2d 1197.)
We are aware of nothing that compels the conclusion that the phrase "recurring access" has a technical definition. Section 288.5 does not, by its terms, expressly define the phrase "recurring access." Indeed, that phrase is no more expressly defined in section 288.5 than the phrase "resides in the same home with the minor child." Nor does section 288.5's uncodified legislative declaration of purpose expressly define the phrase "recurring access." (See fn. 8, ante.) In fact, the phrase is nowhere to be found in California codes, except in section 288.5, subdivision (a). In contrast, section 288.5 evidences that the Legislature knew how to define terms when it wanted to do so.[9]
The plain meaning of the disjunctive language "[a]ny person who either resides in the same home with the minor child or has recurring access to the child" is simply that section 288.5, subdivision (a), applies to a person who has "recurring access" to the child, even if it is not true that that person "resides in the same home with the minor child." Nothing in the statutory enactments of which section 288.5, subdivision (a), is a part demonstrates that the phrase "recurring access" has a technical definition.
Nor does the preenactment history of section 288.5 demonstrate such a conclusion.[10] Letters and memoranda from the office of the Attorney General, which sponsored the legislation enacted as section 288.5, reflect that office's gradual development of a broad view, articulated in common parlance, concerning the scope of persons governed by that section. Thus, an August 1988 interoffice memorandum which proposed section 288.5 did not even refer to the phrase "recurring access." *587 Instead, that memorandum recommended limiting the section's application to "persons who occupy positions of trust and confidence"; indeed, the memorandum reflects, "[o]thers are unlikely to have the unrestricted access that gives rise to the continuing sexual abuse over a prolonged period of time." (Italics added.) (Deputy Attorney General Edgar A. Kerry, mem. to Assistant Attorney General Arnold O. Overoye, August 25, 1988, pp. 1-2.)[11] Similarly, a September 1988 legislative proposal did not refer to the phrase "recurring access," but referred to the "resident child molester" as a "person in a position of special trust with continuing access to the child[.]" ( [California] Department of Justice, Legislative Proposal, Sep. 23, 1988.)
However, a November 1988 memorandum discussing three alternative drafts of the proposed section 288.5 reflects initial consideration of a broader view, and use of the phrase "recurring access," with its common parlance meaning, to express that view. The memorandum noted that the first draft covered only persons who resided with the child, while the second draft covered persons who resided with the child or had custodial access to the child (that is, anyone in whose custody or protection the child was left). (Deputy Attorney General Edgar A. Kerry, mem. to "All Interested Parties," Nov. 14, 1988, pp. 2-3.)
The memorandum later stated, "Alternative No. 3 [ ] goes even further and covers any person who resides with or has recurring access to the minor. A neighbor or friend without any custodial role would be covered. Clearly, Alternative No. 3 goes beyond the scope necessary to deal with Van Hoek[12] yet, it seems to be consistent with the Van Hoek court's definition of a `resident child molester' as one who resides with or has unchecked access to the child. Of course, the broader the scope of coverage, the more difficult this proposal will be to get through the legislative process. Thus, while Alternative No. 3 seems reasonable and justifiable, it is broader in its scope than is necessary to cover the factual circumstances reflected in Van Hoek, [and other cited cases]." (Deputy Attorney General Edgar A. Kerry, mem. to "All Interested Parties," Nov. 14,1988, pp. 2-3.)[13]
The December 5, 1988 final draft proposed, in pertinent part, that section 288.5 govern "[a]ny person who either resides in the same home with the minor child or has recurring access to the child, ..." ( [California] Department of Justice, Legislative Proposal [final draft], Dec. 5, 1988, p. 1; italics added.)[14] A December 6, 1988, interoffice memorandum reflected, "[a]s you will note, the final draft is Alternative No. 3the broadest of the three proposals. CDAA's Legislative Committee preferred this draft as do we. We can narrow the *588 draft if there is legislative pressure to do so." (Deputy Attorney General Ed Kerry, mem. to Senior Assistant Attorney General Allen H. Sumner, Dec. 6, 1988, italics added.)[15]
Moreover, as discussed below, legislative history reveals that the Legislature, as well as affected members of the public, were aware of the broad scope of the common parlance meaning of the phrase "recurring access." The Attorney General's proposed legislation was introduced in the Assembly in March 1989 as AB 2212, and co-authored by then Assemblywoman K. Jacqueline Speier. (Assem. Bill No. 2212 (1989-1990 Reg. Sess.) as introduced Mar. 10, 1989; 1 Assem. Final Hist. (1989-1990 Reg. Sess.), p. 1490.) A later analysis by the Senate Committee on the Judiciary prepared for a July 18, 1989 hearing before that committee reflects, "`[t]he California Teachers Association [CTA] opposes this bill because it believes that this bill could be detrimental to teachers' rights under certain circumstances. CTA states, `by definition, school teachers have "recurring access" to students placed within their charge. Therefore they are within the sweep of the newly proposed Penal Code 288.5 ..."' (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2212 (1989-1990 Reg. Sess.) as amended May 1,1989, p. 6.)
Despite this opposition, on July 19, 1989, the Senate Committee on the Judiciary unanimously passed AB 2212 (1 Assem. Final Hist. (1989-1990 Reg. Sess.), p. 1490), and an Assembly legislative unit memorandum of that date noted the bill's passage, the teachers' opposition, and the committee's rejection of their opposition. ( [Assembly] Legislative Unit, mem. to "Exec. Staff Leg," July 19, 1989.) [16] AB 2212 later returned to the Assembly; a September 13, 1989 Assembly legislative unit memorandum, updating the bill's progress, noted both CTA's opposition to the bill and the unfavorable reaction of various members of the Assembly to CTA's opposition. ( [Assembly] Legislative Unit, mem. to "Exec. Staff Leg," Sep. 13, 1989; 1 Assem. Final Hist. (1989-1990 Reg. Sess.), p. 1490.) [17] Nothing in the above legislative history reflects that the Legislature rejected CTA opposition to the bill on the grounds that CTA incorrectly had relied on the common parlance meaning of the phrase "recurring access" and that the phrase had a technical meaning.
On October 2, 1989, AB 2212 was approved by the Governor and chaptered by the Secretary of State as Statutes 1989, chapter 1402 (1 Assem. Final Hist. (1989-1990 Reg. Sess.), p. 1490); section four of that chapter contains section 288.5. Although, as we have mentioned, the Attorney General anticipated the possibility that his final draft of the proposed legislation might have to be "narrow[ed]" in response to "legislative pressure," no such narrowing occurred as to the "recurring access" language despite such pressure; the language *589 of the Attorney General's final draft, which we have quoted previously, is virtually identical to that ultimately codified in section 288.5, subdivision (a);[18] and the phrase "recurring access" was adopted verbatim in the subdivision.
We conclude from the preenactment history of section 288.5, subdivision (a), that the phrase "recurring access" originated with the Attorney General's preference of the common parlance meaning of that phrase over the common parlance meaning of the phrase "unchecked access" in People v. Van Hoek, supra; the Attorney General, by adopting the former phrase, rejected a narrow application of section 288.5 merely to persons who occupied "positions of trust or confidence" but intended that the section would broadly apply, even to "[a] neighbor or friend the Legislature and affected members of the public were aware of the broad scope of the phrase "recurring access" during consideration of the proposed legislation; and the phrase was adopted verbatim in the legislation as enacted, absent any legislative indication that the phrase had a meaning different than the common parlance meaning ascribed to it by the Attorney General. (See People v. Franklin (1994) 25 Cal.App.4th 328, 337-338, 30 Cal.Rptr.2d 376 [concluding (although not discussing the "recurring access" element) that a trial court's reliance on the defendant's "position of trust" to aggravate a section 288.5 sentence was proper; no impermissible dual use of an element to aggravate occurred, since neither a defendant's "position of trust" nor "special status" with the child is an element of the section].)[19]
Moreover, our research has revealed that, except for People v. Gohdes (1997) 58 Cal.App.4th 1520, 68 Cal.Rptr.2d 719 (hereinafter Gohdes) (which we discuss below), nothing in published judicial decisions involving section 288.5, and the phrase "recurring access," suggests that that phrase has a technical meaning.[20] Thus, in Grant, our Supreme Court apparently rephrased the "recurring access" element in another nontechnical formulation when that court observed that section 288.5 protected children against child molesters "living with or having close and continuing contact" with the children. (People v. Grant, supra, 20 Cal.4th at p. 155, 83 Cal.Rptr.2d 295, 973 P.2d 72, italics added.) One case, although not specifically discussing the "recurring access" language, informally observes the related point that section 288.5 "is [not] aimed ... at the stranger who happens to encounter the same victim three times, ..." People v. Avina (1993) 14 Cal. App.4th 1303, 1311, 18 Cal.Rptr.2d 511, italics added.)
A final observation is appropriate. We construe the phrase, "recurring access," like all statutory language, in context, and we avoid interpretations that make words unnecessary or redundant. (People v. Fierro (1991) 1 Cal.4th 173, 262, 3 Cal.Rptr.2d 426, 821 P.2d 1302.) Accordingly, the phrase "recurring access" cannot mean simply that what is "recurring" is the fact of "access" concomitant to *590 the commission of "three or more acts of substantial sexual conduct" or "three or more acts of lewd or lascivious conduct" for purposes of section 288.5, subdivision (a). Otherwise, the phrase "recurring access" would be surplusage. Moreover, section 288.5, subdivision (a), would then conflict with Avina's observation that section 288.5 does not apply to "the stranger who happens to encounter the same victim three times." (People v. Avina, supra, 14 Cal.App.4th at p. 1311, 18 Cal.Rptr.2d 511, italic added.) We construe the phrase "recurring access" to require that the circumstances of "access" must be "recurring."
We hold that the phrase "recurring access" in section 288.5, subdivision (a), does not have a "technical sense peculiar to the law," that is, a "statutory definition differ[ing] from the meaning that might be ascribed to the same terms in common parlance," and that the phrase "recurring access" requires only that the circumstances of "access" be "recurring." Since Rodriguez did not request amplification of that phrase, the trial court did not err by failing to define it. (See People v. Estrada, supra, 11 Cal.4th at pp. 574-575, 46 Cal.Rptr.2d 586, 904 P.2d 1197, and cases cited.)

b. Gohdes's Reasoning And Result Were Wrong And, To The Extent Gohdes Suggests A Technical Meaning For The Phrase "Recurring Access," We Decline To Follow Gohdes.

Rodriguez cites Gohdes in support of his claim of instructional error.[21] Relying on that case, he urges that section 288.5, subdivision (a), "was meant to apply to persons having a preexisting, special relationship with a child who take advantage of the authoritative relationship and molest the child. Thus, the `recurring access' language has a technical legal requirement unique to section 288.5 and, accordingly, it should have been defined for the jury." (Italics added.) Gohdes, however, was not a case involving alleged instructional error, but alleged evidentiary insufficiency at a preliminary hearing. To the extent Gohdes suggests that the phrase "recurring access" has a technical meaning, we decline to follow it.[22]
In Gohdes, the victim, a 12-year-old girl, was the People's sole witness at a preliminary hearing; her testimony established the following. The defendant, a 22-year-old man, ended his dating relationship with the older sister of the victim. Long afterward, he began secretly and consensually meeting the victim at night by climbing through her window; she lived in a room behind a garage, while her parents lived in the house upstairs. In her room, over a period of time, the victim and defendant intermittently engaged in consensual kissing, fondling, and sexual activity short of intercourse until, about two years later, they engaged in a single act of sexual intercourse.[23] The act of sexual intercourse was "`partly [the victim's] idea'"; before the act, the defendant indicated to the victim that he thought she was going to wait until she was 18 years *591 old before having sexual intercourse. (Gohdes, supra, at p. 1523, 68 Cal.Rptr.2d 719.) The defendant "never threatened her, and she was initially flattered by his attention." (Ibid.)[24]
The defendant in Gohdes was charged with a violation of section 288.5, subdivision (a). If convicted, the 22-year-old defendant faced a maximum sentence of 16 years in prison. At the conclusion of the preliminary hearing, the defendant moved to dismiss the complaint for insufficiency of the evidence, arguing there was no "recurring access." The magistrate granted the defendant's motion.
Significantly, the magistrate's initial observations when granting the motion did not expressly refer to whether the defendant had "recurring access"; that phrase would have focused the magistrate on the nature of the defendant's access to the child. Instead, the magistrate focused on the fact that the defendant did not have a "position of trust in the family" of the child and, therefore, did not have unlimited access to the child. (Gohdes, supra, at p. 1524, 68 Cal.Rptr.2d 719.) It thus appears that the appellate opinion in Gohdes owes its origin to a magistrate's observations which did not expressly refer to the "recurring access" language finally proposed by the Attorney General and later adopted by the Legislature, but did expressly refer to the very "position of trust" language which the Attorney General, as sponsor of the section, considered and rejected.
Moreover, the magistrate, when later returning to the "recurring access" issue, stood by its ruling but narrowed the scope of section 288.5, subdivision (a), still further by implying it required that the defendant have a "relationship with the family," "access to the child for a legitimate purpose, ... in the home," and that the defendant abuse the child during an "otherwise legitimate visit" to the home. (Gohdes, supra, at p. 1524, 68 Cal.Rptr.2d 719, italics added.) The magistrate concluded that the victim's availability due to the placement of her room was not "recurring access." (Id, at pp. 1524-1525, 68 Cal.Rptr.2d 719.)
The People later filed an information alleging the section 288.5, subdivision (a), violation and other charges; the defendant moved to dismiss the section 288.5, subdivision (a), allegation based on a claimed lack of "recurring access." (Gohdes, supra, at p. 1525, 68 Cal.Rptr.2d 719.) Significantly, and similar to the magistrate's initial observations, the trial court did not expressly rule that there was insufficient evidence of the element that the defendant have "recurring access." Instead, the trial court ruled in conclusory fashion that, based on the language and intent of the statute, the statute as a whole did not govern defendant's conduct. (Id. at p. 1525, 68 Cal.Rptr.2d 719.)[25] The trial court granted the motion and the People appealed. (Id. at pp. 1522, 1525, 68 Cal. Rptr.2d 719.)
Relying upon the less than complete legislative history materials supplied by the People (Gohdes, supra, at p. 1527, 68 Cal. Rptr.2d 719), the Gohdes court concluded that the phrase "recurring access" must have a "qualitative" construction. Such qualitative construction of the "recurring access" element is "the only type of construction *592 suggested in the legislative history: uncles, babysitters, ex-spouses, nonlive-in lovers, etc." (Gohdes, supra, at p. 1529, 68 Cal.Rptr.2d 719.) The court concluded that, "[t]here are two common characteristics of these categories. One is that in most categories suggested, the person with recurring access to the child also is in a position of authority over the child, or is in a position to command respect or obedience from the child. A second is that in each of these categories, there was an ongoing relationship between the person with recurring access and the child separate and apart from the relationship formed and characterized by the forbidden sexual activity. Even apart from the sexual activity, the uncle was still the uncle; the father, the father; the babysitter, the babysitter; the mother's boyfriend, the mother's boyfriend, and so forth. There is no analogous independent relationship in the instant case." (Gohdes, supra, at p. 1529, 68 Cal.Rptr.2d 719, italics added.)
Gohdes concluded that the "Legislature must have intended a qualitative ... construction of the `recurring access' element." (Gohdes, supra, at p. 1529, 68 Cal.Rptr.2d 719.) But Gohdes's subsequent discussion concerning "two common characteristics" does not provide a qualitative construction of the "recurring access" element. Instead, the language of the first of the "two common characteristics" merely contains the unconstrued phrase "recurring access," then adds a new element that the defendant "person" be in a specified position with respect to the "child." Similarly, the language of the second of the "two common characteristics" merely contains the unconstrued phrase "recurring access," then adds a new element that a specified relationship exist between the "person" and the "child."
Apart from the fact that Gohdes has thus judicially rewritten section 288.5, subdivision (a), to impose a burden on the People of demonstrating one of the above new elements, the addition of those new elements resurrects "position of trust" and relationship considerations which the Attorney General rejected in his final draft of the proposed legislation and, we would have thought, put to rest. Moreover, apart from the fact that the "two common characteristics" identified by the Gohdes court are arguably so broad as to be present in every case involving multiple sexual contacts between an adult and a child, the "two common characteristics" provide neither a basis for drafting a coherent or useful jury instruction nor a justification for doing so. And, as we have previously explained, the term "recurring access" has a commonly accepted meaning and would already appear to be at its lowest level of abstraction.[26]
It thus appears that the Gohdes analysis conflicts with the legislative intent of section 288.5, subdivision (a), which was to broaden the scope of persons governed by that section in response to an "immediate need for additional statutory protection *593 for the most vulnerable" among us. Section 288.5, subdivision (a), was designed to make the prosecution of multiple sexual molestations of a child easier than it had been under section 288, subdivision (a). Under Gohdes, however, a prosecution under section 288.5, subdivision (a), could now be more difficult than a prosecution under section 288, subdivision (a). Gohdes's analysis may or may not be wise, but whether section 288.5, subdivision (a), should embrace it is for the Legislature, not a court, to decide. In any event, nothing in Gohdes invests the phrase "recurring access" with a technical meaning and, to the extent Gohdes's reasoning suggests differently, we decline to follow it.[27] The instructions given to the jury were sufficient.

2. There Was Sufficient Evidence To Support Rodriguez's Convictions.

Our above discussion compels the rejection of Rodriguez's related contentions that there was insufficient evidence of "recurring access" and, therefore, insufficient evidence to support his convictions. The pertinent facts, discussed in our factual summary, ante, reveal as to count two that Rodriguez repeatedly sexually molested Fernando V. in Rodriguez's trailer, threatening to kill him or a family member unless he submitted. On a few occasions, Fernando V. recalled seeing a gun. When Rodriguez would sodomize Fernando V, he would have him bend over, then grab him by the waist. Rodriguez would have Fernando V. bend over both on and off the bed. Sometimes, Rodriguez used a lubricant. When Rodriguez would have Fernando V. orally copulate him, Rodriguez would grab Fernando V. by his head.
As to count one, Rodriguez likewise repeatedly sexually molested Ernesto R. in Rodriguez's trailer, and in Ernesto R.'s grandparents' house. In the trailer, Rodriguez would repeatedly molest Ernesto R. when his uncle was not within eyeshot. He would also repeatedly pull down Ernesto R.'s pants and underwear, push him on the bed, and sodomize him. Rodriguez also repeatedly orally copulated Ernesto R. in the trailer. In Ernesto R.'s grandparents' room, Rodriguez repeatedly raised Ernesto R.'s feet and sodomized him. Rodriguez repeatedly removed Ernesto R.'s clothing in his mother's room and sodomized him. In the living room, Rodriguez repeatedly touched the outside of Ernesto R.'s clothing, then put Rodriguez's hand down the front of Ernesto R.'s pants.
Therefore, as to each count, not merely the fact of "access," but the circumstances of "access," were "recurring," and we hold there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that Rodriguez committed the crimes of which he was convicted, including sufficient evidence of the requisite "recurring access." (People v. Ochoa, supra, 6 Cal.4th at p. 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103; § 288.5, subd. (a).)[28]

*594 3. Each Restitution Fine Must Be Reduced.

Respondent correctly concedes that the trial court imposed a $12,000 restitution fine under section 1202.4, subdivision (b), and a $12,000 restitution fine under section 1202.45, even though the maximum lawful amount of each fine was $10,000. (People v. Blackburn (1999) 72 Cal.App.4th 1520, 1534, 86 Cal.Rptr.2d 134.) Each fine must be reduced accordingly.

DISPOSITION
The judgment is modified by reducing each of the section 1202.4, subdivision (b), and section 1202.45, restitution fines to $10,000, and, as modified, the judgment is affirmed.
KLEIN, P.J., and FIDLER, J.[*], concur.
NOTES
[1] Unless otherwise indicated, all statutory references are to the Penal Code.
[2] (Stats. 1989, ch. 1402, § 1, p. 6138.)
[3] Although Fernando V. so testified, his mother testified that he was on one of Rodriguez's teams.
[4] Section 288.5, subdivision (a), provides, "[a]ny person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."
[5] The instruction read: "[Defendant is accused [in Count[s] 1 & 2 of the crime of continuous sexual abuse of a child in violation of Section 288.5(a) of the Penal Code.]] [¶] Every person who, either resides in the same home with a minor child or has recurring access to a child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense is guilty of the crime of continuous sexual abuse of a child, a violation of Penal Code Section 288.5(a). [¶] [`Substantial sexual conduct' means penetration of the vagina or rectum by the penis of the offender or by any foreign object, oral copulation, or masturbation of either the victim or the offender.] [¶] [The law does not require that the lust, passions, or sexual desires of either of such persons be actually aroused, appealed to, or gratified.] [¶] [It is no defense to this charge that the child under the age of 14 years may have consented to the substantial sexual conduct or the lewd or lascivious conduct.] [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person [had recurring access to a minor child]; and [¶] 2. That person over a period of time, not less than three months in duration, engaged in [three or more acts of substantial sexual conduct] with the child under the age of 14 years at the time of the commission of the [sexual] conduct. [¶] [Evidence has been introduced for the purpose of showing that there are more than three acts of substantial sexual conduct upon which a conviction [in Count[s] 1 & 2] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt and you unanimously agree that the defendant committed three of these acts. It is not necessary that you unanimously agree on which acts constitute the required number.]"
[6] We note that, at sentencing, the trial court observed that "recurr[ing] access . .. [was] a given ...." in the present case.
[7] There, the court observed that, in a criminal case, a trial court has a duty to instruct the jury on general principles of law relevant to the issues raised by the evidence. The general principles of law governing the case are those connected with the evidence and which are necessary for the jury's understanding of the case. As to pertinent principles which are not general principles, it is a defendant's obligation to request a clarifying or amplifying instruction. (People v. Estrada, supra, 11 Cal.4th at p. 574, 46 Cal.Rptr.2d 586, 904 P.2d 1197, and cases cited.) Moreover, Estrada observed that the language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language. (Ibid.)
[8] As our Supreme Court observed in People v. Grant, supra, "[b]efore the passage of section 288.5, such crimes were generally charged under subdivision (a) of section 288 (section 288(a)). The latter statute proscribes the willful and lewd commission of `any lewd or lascivious act' on or with a child under the age of 14 years, with `the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires' of the perpetrator or the child. Often, the child in section 288(a) cases would relate multiple acts of molestation over a lengthy period of time but could not recall with specificity where, when, or how individual acts of sexual abuse had occurred. As a consequence, the pleadings in such cases generally omitted such specifics. [¶] Illustrative of these problems in pleading and proving a violation of section 288(a) is People v. Van Hoek (1988) 200 Cal.App.3d 811, 246 Cal. Rptr. 352, ... There, the Court of Appeal held that the prosecutor's failure in a section 288(a) case to plead and prove a specific instance of molestation violated the defendant's constitutional right to due process of law. The court reasoned: `Where, as here, the evidence is that many of such acts were committed over an extended period of time, it would be impossible for the prosecution to "select the specific act relied upon to prove the charge" and equally impossible for the jury to "unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act."` (People v. Van Hoek, supra, 200 Cal.App.3d at p. 816, 246 Cal.Rptr. 352.) [¶] The next year, in response to [Van Hoek], the Legislature enacted section 288.5. Unlike section 288(a), which proscribes an act of molestation, section 288.5 prohibits a continuing course of conduct: the repeated sexual abuse of a minor by an adult who has regular access to the minor. Thus, to establish a violation of section 288.5, the jury must unanimously agree that during the period alleged in the indictment or information the defendant engaged in a pattern of abuse that included at least three acts of molestation, but it need not agree on when or where these acts occurred. [Citations; fn. omitted.] [¶] Section 288.5 has this [uncodified] legislative declaration of purpose: [¶] `(a) The Legislature finds and declares that because of the court's decision in People v. Van Hoek [, supra, 200 Cal.App.3d 811, 246 Cal.Rptr. 352], there is an immediate need for additional statutory protection for the most vulnerable among our children, those of tender years, some of whom are being subjected to continuing sexual abuse by those commonly referred to as "resident child molesters." These molesters reside with, or have recurring access to, a child and repeatedly molest the child over a prolonged period of time but the child, because of age or the frequency of the molestations, or both, often is unable to distinguish one incident from another in terms of time, place, or other particulars, and as a consequence prosecutors are unable to provide the specificity of charges necessary to overcome the constitutional due process problems raised in the Van Hoek case within the framework of existing statutory law. As a consequence, some of our most vulnerable children continue to be at risk and some of our worst offenders continue to go unpunished. [¶] `(b) It is the intent of the Legislature in enacting this act to provide additional protection for children subjected to continuing sexual abuse and certain punishment for persons referred to as "resident child molesters" by establishing a new crime of continuing sexual abuse of a child under circumstances where there have been repeated acts of molestation over a period of time, and the perpetrator either resides with or has recurring access to the child. It is the further intent of the Legislature that the penalty for this crime shall be greater than the maximum penalty under existing law for any single felony sex offense.' (Stats. 1989, ch. 1402, § 1, p. 6138, italics added.)" (People v. Grant, supra, 20 Cal.4th at pp. 155-156, 83 Cal.Rptr.2d 295, 973 P.2d 72.)
[9] Section 288.5, subdivision (a), expressly defines the phrase "substantial sexual conduct" by reference to section 1203.066, subdivision (b), and expressly refers to section 288, with its definition of a lewd or lascivious act.
[10] Having notified the parties of our intent to do so, and having received no objection, we take judicial notice of the preenactment history discussed infra.
[11] The memorandum stated that persons in a position of trust or confidence were "parents, stepparents, relatives, sex partners, etc.," that is, "the types of defendants involved in the cases that have triggered this proposal," but the term also included "babysitters, teachers, camp counselors, etc." (Ibid.)
[12] In Van Hoek, the defendant was the father of the child victim. (People v. Van Hoek, supra, 200 Cal.App.3d at p. 813, 246 Cal.Rptr. 352.)
[13] A November 16, 1988 letter from Kerry to the California District Attorney's Association (CDAA) reflects that CDAA contributed to discussions leading to the three alternative legislative proposals, and CDAA's views concerning those proposals were solicited. (Deputy Attorney General Edgar A. Kerry, letter to Gary Mullin, Executive Director, CDAA, Nov. 16, 1988.)
[14] It also proposed other language which was ultimately enacted. See fn. 18, infra.
[15] The memorandum reflected that a final version of an explanatory memorandum which might "be useful in discussing the proposal with a prospective author," as well as a legislative proposal summary, were enclosed.
[16] A third reading analysis by the Senate Rules Committee on the bill as amended on September 5, 1989, also referenced the CTA's opposition. (Sen. Rules Com, Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2212 (1989-1990 Reg. Sess.) as amended Sep. 5, 1989, p. 5.)
[17] A later letter from Assemblywoman Speier to the Governor, recommending that he sign AB 2212, noted "[t]he gravamen of the new crime would be the repeated sexual abuse of a child over a prolonged period of time by a person with recurring access to the child. This will usually be a parent or stepparent." (Assemblywoman K. Jacqueline Speier, letter to the Governor, Sep. 20, 1989, p. 1.)
[18] Section 288.5, subdivision (a), as enacted, merely added the word "child" immediately after the word "minor" in the language of the Attorney General's December 5, 1988 final draft of that subdivision. The final draft also proposed other language, portions of which, after amendment, were either codified at section 288.5, subdivisions (b) and (c), or enacted as the uncodified legislative declaration of purpose reflected in footnote 8, ante.
[19] We note that, in his supplemental brief, Rodriguez concedes that "the broad brush terminology" of the Attorney General's "third alternative" was "enacted into law."
[20] Our use of two computerized legal research services reveals that there are 18 published decisions involving section 288.5 and the phrase "recurring access"; except for Gohdes, none suggest the phrase has a technical meaning.
[21] We invited, and received, supplemental briefing on whether Gohdes supported Rodriguez's instructional claim, and whether Gohdes improperly concluded that whether a child consented to a defendant's sexual conduct was pertinent to the determination of whether "recurring access" exists.
[22] Gohdes is the only published decision we have found presenting a sufficiency issue regarding the "recurring access" element.
[23] During this time, about a year after they first began to meet, the victim and her family moved to a different home, where someone standing at the victim's bedroom window could be observed from the street.
[24] In its statement of facts, the Gohdes court, for no expressed reason, recited the victim's alcohol and narcotics use during the period at issue, and her narcotics use even after the period at issue.
[25] Gohdes thus erred when it purported to "agree with the trial court that the facts the People set forth at the Penal Code section 995 hearing [did] not amount to recurring access...." (Gohdes, supra, at p. 1522, 68 Cal. Rptr.2d 719; italics added.)
[26] Moreover, Gohdes "conclude[d] that the surreptitious assignations involved in this case do not meet the statutory requirement of `recurring access.'" (Gohdes, supra, at p. 1529, 68 Cal.Rptr.2d 719, italics added.) The term "assignations" suggests consensual sexual activity and, therefore, that Gohdes concludes that whether a child consents to the defendant's sexual molestations is pertinent to the determination of whether "recurring access" exists. However, there is no dispute that it is no defense to a charge of section 288.5, subdivision (a), that the child consented to the substantial sexual conduct or lewd or lascivious conduct. The jury was so instructed in the present case (see fn. 5, ante), and there is no dispute that that instruction correctly states the law. Nonetheless, Gohdes erroneously suggests that proof of a child's consent to sexual molestations can negate the "recurring access" element and, therefore, the People's case-in-chief.
[27] Appellant's reliance on Gohdes provides yet another example of the settled principle that language in appellate court opinions does not always constitute an appropriate jury instruction. (People v. Adams (1987) 196 Cal. App.3d 201, 204-205, 241 Cal.Rptr. 684.)
[28] In part 1 of our discussion, we have concluded that neither the "recurring access" element nor section 288.5, subdivision (a), requires proof of either of the "two common characteristics" referred to in Gohdes. However, we do not hold that whether (1) the defendant "person" is in a position of authority over the "child," or is in a position to command respect or obedience from the "child" or (2) there was an ongoing relationship between the "person" and "child" separate and apart from the relationship formed and characterized by the forbidden sexual activity cannot be considered as a factor in the determination of whether "recurring access" exists, that is, whether "circumstances of access" are "recurring."
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.